UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UPPER PENINSULA POWER
COMPANY,

     Plaintiff,

v.

LOCAL 510 INTERNATIONAL
BROTHERHOOD OF ELECTRICAL
WORKERS, AFL-CIO,

     Defendant.

_____/

Case No. 2:26-cv-27

Hon. Hala Y. Jarbou

**<u>OPINION</u>**

Plaintiff Upper Peninsula Power Company (UPPCO) brings this lawsuit seeking vacatur of an arbitral award that required it to reinstate former employee Phil Hansen.  Before the Court is UPPCO's motion to stay enforcement of the arbitration award pending the outcome of this lawsuit (ECF No. 6.)  For the reasons explained below, the Court will deny the motion.

## I. BACKGROUND

This lawsuit concerns Hansen's termination by UPPCO in November 2024.  UPPCO is an electricity distribution company that operates in Michigan's Upper Peninsula.  (*See* Compl. ¶¶ 1, 7, ECF No. 1.)  Hansen worked at UPPCO as an apprentice lineman from July 2022 until his termination; he first worked at the company's Ontonagon location, but later transferred to Houghton.  (Arbitration Op. 20, ECF No. 1-2.)  UPPCO terminated Hansen on November 24, 2024, primarily due to concerns that Hansen had engaged in unsafe behavior that put him or his coworkers in danger.  (Compl. ¶¶ 19–20.)  Hansen's employment with UPPCO was governed by a Collective Bargaining Agreement (CBA) with Defendant Local 510 International Brotherhood

of Electrical Workers, AFL-CIO (IBEW).  (Compl. ¶¶ 11–12.)  After his termination, Hansen filed

a grievance under the CBA, which provides for arbitration of wrongful discharge claims.  (*See*

CBA 42–43, ECF No. 1-1.)  Meanwhile, Hansen obtained employment with another power

company (M.J. Electric), but that job required him to travel across several states and spend more

time away from his family.  (Hansen Aff. ¶¶ 5, 10, ECF No. 25-3.)

On January 21, 2026, Arbitrator Thomas J. Barnes issued an opinion and award finding

that Hansen's termination had violated the CBA and requiring his reinstatement.  (*See* Arbitration

Op.)  UPPCO reinstated Hansen but immediately placed him on paid leave rather than allowing

him to continue working.  (Hansen Aff. ¶ 8.)  It now seeks vacatur of the arbitral award.

Barnes's opinion contains the following factual findings, which the Court accepts as true

for the purposes of reviewing the arbitral award.  When Hansen was terminated he was still an

apprentice under supervision, having yet to achieve "journeyman" status.  (*See* Arbitral Op. 3, 5.)

His apprenticeship was monitored by the Joint Apprenticeship and Training Committee (JATC).

(*See id.* at 3–4.)  The JATC was responsible for issuing Performance Improvement Plans (PIPs),

which set out the timeline of an apprenticeship and the evaluation schedule for that apprentice.

(*See id.* at 3–5, 18.)  Hansen was terminated soon after being placed on his third PIP.  (*See id.* at

3.)  This PIP extended Hansen's apprenticeship by six months and froze the tracking of Hansen's

hours, which would be used to determine when he took the test to become a journeyman.  (*See id.*

at 5.)[1]  Hansen had requested additional hours because he felt he had not gotten enough experience

to take the journeyman test.  (*Id.* at 23.)  But it was unusual for an apprentice to receive three PIPs,

and management viewed the PIPs as "a gift" to Hansen insofar as he was being given additional

---

[1] According to IBEW, at the time Hansen had completed 6,910.5 of the 7,000 hours required by the apprenticeship
program.  (Def.'s Resp 1, ECF No. 25.)

time to try to improve his performance.  (*Id.* at 3, 8.)  One member of the JATC, Andrew DeVries, described the third PIP as a "Last Chance Agreement."  (*Id.* at 6.)

The JATC enacted the third PIP after meeting with Hansen's coworkers to discuss whether he was qualified to become a journeyman.  (*See id.* at 5.)  The issues discussed at the meeting were ultimately the basis of Hansen's termination a few weeks later.  (*See id.* at 13.)  Much of the discussion revolved around potential safety issues implicated by Hansen's conduct.  (*See id.* at 5–6.)  Ryan Pantti, another member of the JATC, testified that the committee had been concerned about "red flags" since the beginning of Hansen's employment.  (*Id.* at 4.)  Specifically, they were concerned that Hansen had a habit of "rushing in to do things" without a plan, or, as Pantti described it, going "into the fire looking for a bucket of water."  (*Id.*)  According to Devries, most of Hansen's coworkers "expressed concern about [Hansen] which . . . amounted to the fact that they didn't trust him."  (*Id.* at 5.)  Testimony at the arbitration hearing revealed the following specific safety incidents:

- Matthew Mattila, an Assistant Crew Leader, testified about an incident in which Hansen had picked up an electrical line in the road without discussing beforehand with Mattila how they were going to proceed.  (*Id.* at 6–7.)  But Hansen testified that another lineman, Paul Bridges, had directed him to pick up the line.  (*Id.* at 22.)

- DeVries testified that one of Hansen's coworkers related an incident in which Hansen had answered the phone while they were working on a power line, which DeVries viewed as dangerous.  (*See id.* at 6.)  Hansen testified that he did not recall the event but that "he may have been communicating by a hand held radio or call to a crew member," and that he would have been outside of the "minimum approach distance"

(i.e., the area of heightened danger) and would have worn gloves and sleeves. (*Id.* at 21.)

- Andy Imbrunnone, the union steward, testified about a reported incident in which Hansen had taken off his rubber gloves without informing his partner, Mike Witt. (*See id.* at 15.)  Imbrunnone noted that this incident occurred outside of the minimum approach distance, so Hansen was not required to wear his gloves, although there was still a concern about proper communication with his partner. (*Id.* at 15–16.)  Hansen disputed whether this incident had occurred; he testified that he had never worked with Witt as his partner.  Witt did not testify as to the accuracy of Imbrunnone's secondhand account of the incident. (*Id.* at 23.)

- Imbrunnone also related an incident in which a coworker had to remind Hansen to put on his "sleeves," a type of protective gear, before he headed towards the work area. (*Id.* at 16.)  Hansen testified that he had still been outside the minimum approach distance at the time and was planning to put on his sleeves. (*Id.* at 24.)

- Mike Gagnon, a fellow lineman who had spent significant time working with Hansen, testified about an incident during a training exercise when Hansen dropped a wire. Gagnon noted that mistakes of that sort "could happen from time to time" and that every lineman drops things. (*Id.* at 19.)  Hansen recalled this incident and testified that afterward, he and Gagnon had trained extensively on tying up wires and he had never made the same mistake. (*Id.* at 24.)

- Operations Supervisor Joe Marcotte testified that he had heard from Bryon Poyhonen, another lineman, about an incident in which Hansen threw his gloves on the ground

while on the job. (*Id.* at 22.) Hansen testified that he would not have done that and that he may have just been placing them on his knee. (*Id.*)[2]

- Marcotte also testified that another lineman, Dave Heinonen, had reported Hansen using his phone without his gloves on, though Heinonen was unsure as to whether this had occurred within the minimum approach distance. (*Id.*) Hansen testified that he had never used his phone with his gloves off inside the minimum approach distance. (*Id.*)

- Marcotte also testified that Lineman Jamie Heinonen had relayed an incident in which he was using machinery to move a tree trunk to a designated area and almost dropped the trunk on Hansen, who was not standing in the proper location. Hansen testified that he "vaguely recall[ed]" the incident, but that Heinonen had not brought it to his attention at the time. (*Id.* at 23.) Hansen also opined that Heinonen should have been paying attention to where Hansen was walking and that "a lineman doesn't just drop tree branches or debris without looking." (*Id.*)

- One of Hansen's evaluations referred to an incident in which he operated an articulating boom lift without properly communicating with coworkers who were above him. Hansen testified that in that instance he was directed to operate the lift by the workers above him, and that he would not operate a boom lift without communicating properly. (*Id.* at 22.)

During their testimony, Hansen's supervisors and coworkers also expressed general concern about his behavior. Mattila testified that there were "trust issues" with Hansen and his

---

[2] It is unclear from the arbitral opinion whether throwing one's gloves on the ground is considered a safety issue or merely an unprofessional outburst.

coworkers.  (*Id.* at 8.)  Marcotte testified that he had often been frustrated with Hansen's lack of progress because Hansen "thought he knew everything already, and that he did not need some journeymen that were younger than him telling him what to do." (*Id.* at 10.)  Marcotte noted that he had received many complaints from Hansen's coworkers and explained that "there [were] many, many, many [safety] incidents throughout the apprenticeship." (*Id.*)  He felt that if Hansen had not been constantly supervised during his work, there could have been a serious accident.  (*See id.* at 11.)  Steve Baril, the Director of Safety and Employee Relations at UPPCO, testified that Hansen did not have any "safety incidents as such" but that there were several events "that gave him concern" such that "he couldn't believe what he was hearing." (*Id.* at 12.)  Baril conducted an investigation into Hansen's behavior and did not find any "specific incident" constituting a safety violation, but he did find "a pattern" of actions on Hansen's part "that could lead to further serious safety issues." (*Id.* at 13.)  Baril explained that Hansen's coworkers spoke about "instances where had they not warned [Hansen], he would have put himself in grave danger." (*Id.*)  Gradon Haehnel, the CEO of UPPCO, testified that the information relayed to him from management suggested Hansen was "a walking hazard." (*Id.* at 14.)  Gagnon testified that he had never seen Hansen "put himself in harm's way" but that he had observed things that he would have "prefer[red] [Hansen] to have done . . . differently." (*Id.* at 19.)  On the other hand, Senior Lineman Jeff Benda testified that the mistakes Hansen had allegedly made "were not uncommon problems and that he didn't know of any apprentice that he didn't have to tell to slow down." (*Id.* at 26.)

Barnes also considered Hansen's evaluations, which generally were positive but indicated that Hansen needed to avoid rushing into jobs.  (*Id.* at 27–28.)  Barnes concluded "that there was a pattern of concerns about [Hansen]'s attention to the job, his hurriedness in doing things and his failure to see the bigger picture." (*Id.* at 28.)  However, the evaluators generally gave Hansen

6

positive safety ratings: in 2024, 12 of his 13 evaluations categorized him as "usually safe worker, knows safety rules and tries to be careful," and one categorized him as "very careful," the highest level. (*Id.* at 31.)  Most of the evaluations also indicated that he was progressing satisfactorily. (*See id.*)

Ultimately, Barnes concluded that UPPCO's discharge of Hansen was unwarranted under the CBA.  He noted that while many people had testified as to general concerns about Hansen's conduct, or about "incidents which portended future safety problems," there was no evidence that Hansen had committed any actual safety violations; Marcotte, Pantti, and Baril had all agreed on this point. (*Id.* at 32–33.)  Prior to his termination, Hansen had never been disciplined for any safety issue.  Indeed, Barnes found it concerning that UPPCO had not taken any disciplinary action against him prior to termination. (*Id.*)  He noted that UPPCO should have imposed "progressive discipline" in the form of a "written warning, suspension, or simply one notice that any further occurrences will result in discharge." (*Id.* at 35.)  Barnes described Hansen's termination as "a classic example of waiting until the last minute and dumping a number of concerns about [Hansen]'s conduct in order to support his discharge." (*Id.* at 33.)  While Barnes acknowledged that UPPCO was reasonably concerned about Hansen's unsafe behavior, he explained that it is a "bedrock principle" of labor arbitration that "an employer is not at liberty to wait until a number, even a number of proven infractions, pile up and then decide to discipline or discharge an employee." (*Id.* at 33–34.)  Thus, Barnes ordered UPPCO to reinstate Hansen as an employee, although he recommended that the JATC amend Hansen's "third PIP to provide for a one year period of time for [Hansen] to meet his obligations to achieve journeyman status rather than six months." (*Id.* at 37.)

On January 23, 2026—two days after issuing the arbitral award—Barnes spoke to counsel from both parties over the phone.  (*See* Call Tr., ECF No. 1-4, PageID.134.)  Barnes convened the call because he wanted to convey that he had concerns about Hansen's ability to succeed upon reinstatement and thought Hansen was not "going to make it without some intervention outside of work."  (*Id.*, PageID.137.)  Barnes explained that he had not included this detail in the original opinion for the sake of privacy.  (*See id.*, PageID.137, 141.)  But Barnes believed that Hansen would "need a few months" in order to "f[i]nd a new approach."  (*Id.*, PageID.144.)  Barnes noted that Hansen did not seem to "like taking orders from people that are younger" and "has a little bit of an attitude . . . that, you know, he knows it all."  (*Id.*)  Barnes noted that "we all know that's a dangerous kind of situation to be doing the kind of work that he's doing."  (*Id.*, PageID.144–145.)  Barnes recommended that Hansen get assistance, "psychological or otherwise," and noted that he would be willing to add this condition to the arbitral award if Hansen was unlikely to otherwise agree to it.  (*Id.*, PageID.138.)

Barnes suggested that Baril should determine the details of the assistance to be provided to Hansen because Baril "did the investigation" and had "as good an idea as anybody of what safety issues [Hansen] poses and what the psychologist might do to help with that."  (*Id.*, PageID.144.)  UPPCO's counsel requested that Barnes put this condition in writing (*id.*, PageID.143–144), so Barnes subsequently issued a confidential supplement to the opinion (*see* Supp. Award, ECF No. 1-5).  In the supplement, Barnes stated that as a condition of being reinstated by UPPCO, Hansen was required to "meet with Safety Director Baril to arrange for [Hansen] to receive professional help in connection with his performance of his job functions as Baril deems appropriate."  (Supp. Award, PageID.147.)

## II. LEGAL STANDARDS

### A. Review of Arbitral Awards

The Court has power to review the arbitral award at issue here under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185.  The Court must "afford great deference to the arbitrator's decision."  *Equitable Res., Inc. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO/CLC*, 621 F.3d 538, 545 (6th Cir. 2010); *see also Tenn. Valley Auth. v. Tenn. Valley Trades & Lab. Council*, 184 F.3d 510, 514–15 (6th Cir. 1999) ("[O]ur review of an arbitration award is one of the narrowest standards of judicial review in all of American jurisprudence." (cleaned up)).  The arbitral award should be upheld if the arbitrator "was arguably construing or applying the contract and was not disqualified by fraud or a conflict of interest."  *Equitable Res.*, 621 F.3d at 545 (cleaned up).

"Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and the meaning of the contract that they have agreed to accept."  *Oakwood Healthcare, Inc. v. Oakwood Hosp. Emps. Loc. 2568*, 615 F. App'x 302, 304 (6th Cir. 2015) (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 37–38 (1987)). Thus, "[c]ourts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement."  *Id.* (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001)).  "[T]he request for judicial intervention should be resisted even though the arbitrator made serious, improvident or silly errors in resolving the merits of the dispute."  *Id.*

### B. Motion for Stay

Generally, a court addressing a stay request "consider[s] the same four factors that are traditionally considered in evaluating the granting of a preliminary injunction."  *Mich. Coal. of*

*Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991); *see also Nken v. Holder*, 556 U.S. 418, 434 (2009) ("There is substantial overlap between these and the factors governing preliminary injunctions, not because the two are one and the same, but because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." (cleaned up)).  Thus, the Court must consider:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken*, 556 U.S. at 426.  "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal."  *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

## III. ANALYSIS

UPPCO argues that the arbitral award must be vacated for three reasons: (1) the award does not draw its essence from the CBA, (2) the award violates public policy, and (3) Barnes exceeded his authority by ordering that UPPCO restore his prior apprenticeship.[3]  The Court finds that UPPCO has not established a likelihood of success on the merits of any of these claims, and thus it is unnecessary to consider the other stay factors.

### 1. Terms of the CBA

First, UPPCO argues that the arbitral award disregarded relevant provisions of the CBA. An arbitral "award is legitimate only so long as it draws its essence from the collective bargaining agreement."  *Mich. Fam. Res., Inc. v. Serv. Emps. Int'l Union Loc. 517M*, 475 F.3d 746, 751 (6th Cir. 2007) (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597

---

[3] UPPCO's brief in support of its motion for a stay fails to include any analysis of its likelihood of success on the merits.  (*See* ECF No. 16.)  The Court thus draws UPPCO's legal arguments from its complaint.

(1960)).  An award draws its essence from the CBA if the arbitrator was "even arguably construing or applying the contract and acting within the scope of his authority."  *Id.* at 752–53 (quoting *Misco,* 484 U.S. at 38).  Here, UPPCO argues that the award violated the provision of the CBA providing that "[n]o employee shall be required to work with an unsafe worker or under unsafe conditions."  (CBA 27, ECF No. 1-1.)  UPPCO contends that reinstating Hansen will place his coworkers in danger due to his unsafe conduct.

Barnes cited the above-quoted CBA provision in the arbitral opinion (Arbitration Op. 30), which indicates that he took it into account when making his decision.  And Barnes was plainly aware of the potential safety concerns posed by Hansen.  But Barnes found that none of these incidents qualified as actual safety violations—a fact that several UPPCO officials acknowledged.  Moreover, he noted that "none of the Employer representatives thought the incidents were serious enough to warrant discipline or at least alert higher levels of management."  (Arbitration Op. 35 n.7.)  Barnes recognized that "the arbitration annals are . . . replete with cases where very serious misconduct warrants discharge on a first offense."  (*Id.* at 32.)  But Barnes did not view Hansen's conduct as severe enough to warrant immediate termination.  Rather, he found that UPPCO should have instituted lesser forms of discipline before terminating Hansen.  The fact that Barnes made no explicit statement as to whether Hansen might act dangerously in the future (such that his reinstatement would violate the CBA's safety provision) does not prevent the Court from drawing reasonable inferences based on what Barnes *did* say.  *See Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173, Int'l Ass'n of Machinists & Aerospace Workers*, 886 F.2d 1200, 1213 (9th Cir. 1989) ("[W]e do not infer the non-existence of a particular reason merely from the [arbitral] award's silence on a given issue.").  If Barnes had agreed with UPPCO that Hansen was

11

dangerous to his coworkers, he would not have ordered his reinstatement. *See id.* (arbitrator's decision to reinstate employee implies a finding that the employee is not dangerous).

In short, Barnes implicitly found that Hansen's behavior was not so dangerous as to create a safety hazard for himself or others. The Court cannot say that Barnes, in doing so, failed to construe or apply the contract. Nor may the Court disturb Barnes's factual findings. Thus, UPPCO is unlikely to succeed on the merits of this claim.

UPPCO argues that this analysis should be impacted by the phone conversation between Barnes and counsel, which (UPPCO contends) reveals that Barnes had doubts about the wisdom of allowing Hansen to return to work. As an initial matter, it is not clear whether the Court may consider this conversation in evaluating the arbitral opinion. The Court's role is to review the arbitration decision, and this is not a case where extrinsic evidence is plainly relevant, such as one where the arbitration award is challenged based on bias or fraud. Generally, "in post-award proceedings an arbitrator cannot be examined for the purpose of impeaching his award, or be impeached by his voluntary statements." *Sperry Int'l Trade, Inc. v. Gov't of Israel*, 602 F. Supp. 1440, 1443 (S.D.N.Y. 1985) (cleaned up). On the other hand, because the phone conversation took place before Barnes issued a supplemental order, it arguably is more similar to a statement by an arbitrator during the arbitration proceeding than a post-judgment statement.

Regardless, even assuming that the Court may rely on the phone call to evaluate the award's validity, the call does not alter the analysis. At most, the call reveals that Barnes thought Hansen might be dangerous without supervision and/or professional assistance. But Hansen will be supervised as an apprentice, and the supplemental order requires him to receive assistance; Barnes plainly thought these conditions were sufficient to mitigate any potential hazard posed by Hansen. *Cf. Stead Motors*, 886 F.2d at 1213 ("[A] court would be hard-pressed to find a public policy

12

barring reinstatement in a case in which an arbitrator has, expressly or by implication, determined that the employee is subject to rehabilitation and therefore not likely to commit an act which violates public policy in the future."). UPPCO argues that imposing the professional assistance condition implicitly indicates that until such assistance is complete, Hansen will be a hazard to himself or others. But that inference is not justified; if Barnes thought that Hansen would be a hazard until he received professional assistance, he would have required Hansen to obtain such assistance before returning to work. *Cf. Oakwood Healthcare, Inc. v. Oakwood Hosp. Emps. Loc. 2568*, 615 F. App'x 302, 309–10 (6th Cir. 2015) (reinstatement of allegedly dangerous employee did not violate public policy where arbitrator required employee to attend anger management classes *after* being reinstated). In sum, although Barnes expressed some concerns about the potential dangers that Hansen could pose, he ultimately concluded that Hansen was safe enough to return to work. And that factual conclusion is binding on the Court.

### 2. Public Policy

Second, UPPCO argues that enforcement of the arbitral award is contrary to public policy. "[C]ourts will not enforce a contract that they independently determine to be contrary to public policy." *MidMichigan Reg'l Med. Ctr.—Clare v. Pro. Emps. Div. of Loc. 79*, 183 F.3d 497, 504 (6th Cir. 1999). "[W]hen an arbitration award is challenged on public policy grounds, the court must determine whether the arbitrator's interpretation of the contract jeopardizes a well-defined and dominant public policy, taking the facts as found by the arbitrator." *Id.* The public policy must "be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id.* (quotation marks omitted). "The issue is not whether grievant's conduct for which he was disciplined violated some public policy or law, but rather whether the award requiring the reinstatement of a[n] [employee], i.e., the contract as interpreted, violated some explicit public policy." *Interstate Brands, Corp. Butternut Bread Div.*

13

*v. Chauffeurs, Teamsters Loc. Union No. 135*, 909 F.2d 885, 893 (6th Cir. 1990) (quotation marks omitted).

UPPCO contends that both Michigan and the federal government have a public policy against allowing dangerous employees to work on electrical lines. *See, e.g.*, 29 C.F.R. § 1910.269 ("Each employee [working on electrical lines] shall be trained in, and familiar with, the safety-related work practices, safety procedures, and other safety requirements in this section that pertain to his or her job assignments."). Even if this is a sufficiently ascertainable public policy, UPPCO has not established that the arbitral award violates it. As discussed above, Barnes found that Hansen had committed no prior safety violations, and in ordering Hansen's reinstatement, Barnes implicitly recognized that Hansen was not a significant safety risk. The Court is bound by that factual finding, and thus cannot conclude that Hansen is likely to pose a significant risk in the future. *See Interstate Brands*, 909 F.2d at 894 (reversing district court's vacatur of arbitration award because inferring future employee misconduct from past misconduct was "an exercise in factfinding, a function the district court was not authorized to perform"); *Misco*, 484 U.S. at 44 ("To conclude from the fact that marijuana had been found in [the employee]'s car that [the employee] had ever been or would be under the influence of marijuana while he was on the job . . . is an exercise in factfinding . . . , a task that exceeds the authority of a court asked to overturn an arbitration award.").

Moreover, Sixth Circuit precedent establishes that even reinstatement of an employee who has committed past safety violations does not necessarily violate public policy. For example, in *MidMichigan Regional*, the Sixth Circuit declined to vacate an arbitral award reinstating a nurse who had made several mistakes on the job, including dispensing the wrong medication and incorrectly operating a defibrillator. 183 F.3d at 499–501. The court acknowledged Michigan's

14

interest in ensuring safe health care, and recognized that the nurse had been "negligent" and made "serious" errors. *Id.* at 504–505. But it nonetheless explained that "[e]ven highly skilled professionals err on occasion, and we think it clear that it cannot violate the public policy of Michigan to contract to retain a nurse guilty of committing some acts of carelessness." *Id.* The court also justified its holding by reference to the company's own standards of conduct, which (according to the arbitrator) categorized the nurse's defibrillator mistake as a "minor infraction[]" for which termination was not warranted. *Id.* at 505. Here, the fact that Hansen's conduct did not even rise to the level of a safety violation similarly supports the arbitrator's decision.

The Sixth Circuit has also declined to vacate reinstatement awards for employees who committed *intentional* misconduct. In *Columbia Gas of Ohio, Inc. v. Utility Workers Union of America*, the employee at issue was a service technician for a company that provided natural gas to homes. 329 F. App'x 1, 1–2 (6th Cir 2009). After repairing underground gas lines, the employee would frequently refill the excavated area with dirt rather than wait for another technician to inspect and test the gas line, as he was required to do. The arbitrator found that the employee "deliberately violated federal and state regulations on twelve occasions by . . . restoring [natural gas] service before independent inspection and testing could be performed." *Id.* at 5. Despite the company's safety concerns—and even though "there [was] no dispute that [the employee]'s *conduct* violated public policy"—the court found that "enforcement of the contractual agreement to reinstate [the employee] with a 14–month suspension would [not] violate public policy." *Id.*; *see also Interstate Brands*, 909 F.2d at 893 (declining to vacate reinstatement award because "[w]hile it is indisputable that allowing intoxicated persons to drive motor vehicles violates public policy, it does not follow . . . that any arbitration award reinstating an employee

15

discharged for being intoxicated while off-duty . . . may never be enforced without violating the public policy exception of arbitration awards").

One out-of-circuit case that potentially supports UPPCO's position is *Iowa Electric Light & Power Co. v. IBEW Local 204*, 834 F.2d 1424 (8th Cir. 1987).  There, a nuclear power plant employee who wanted to take an early lunch disabled a lock that, as a safety measure, kept an interior door closed whenever an outside door was open.  *Id.* at 1425–26.  The Eighth Circuit vacated the arbitral award reinstating the employee because the award contradicted federal policy in favor of safe nuclear power plant operations.  *Id.* at 1428.  But as the Sixth Circuit has observed, the Eighth Circuit subsequently distinguished *Iowa Electric* in *MidAmerican Energy Co. v. IBEW Local 499*, 345 F.3d 616 (8th Cir. 2003), where the court "held that an arbitrator's reinstatement of an employee who disabled forty monitoring and safety devices at a liquid natural gas storage facility and left the facility unattended for several hours did not violate public policy."  *Columbia Gas*, 329 F. App'x at 6.  The Sixth Circuit explained that one of the reasons the Eighth Circuit allowed reinstatement in *MidAmerican* was that "the award did not require [the company] to reinstate [the employee] to a position in which he would be without direct supervision or the safety and security of the facility would be left in his hands."  *Id.*  Similarly, here the arbitral award only requires Hansen to be reinstated as an apprentice, a position that is subject to supervision by more experienced linemen.[4]

In sum, the above cases support the principle that enforcement of an arbitral award does not violate public policy merely because the award reinstates an employee who has previously acted unsafely or negligently, especially when those past actions did not violate company rules or

---

[4] The Sixth Circuit has also recognized that the Ninth Circuit has "criticized . . . *Iowa Electric* . . . as being inconsistent with [Supreme Court precedent] and declined to follow" it.  *Interstate Brands*, 909 F.2d at 894 n.11 (citing *Stead Motors*, 886 F.2d 1200).  The Sixth Circuit, however, declined to "address this schism" because it found *Iowa Electric* distinguishable on the facts.  *Id.*

the law.  Thus, UPPCO is unlikely to succeed on the claim that Hansen's reinstatement violates public policy.

### 3. Resumption of Apprenticeship

Finally, UPPCO argues that the arbitral award requires it to take actions that are beyond its power regarding Hansen's apprenticeship.  Specifically, Barnes appears to have assumed that upon reinstatement, Hansen would be able to resume his apprenticeship where he left off—thus, the arbitral award provides that "[t]he JATC Committee is strongly urged to amend its third PIP to provide for a one year period of time for [Hansen] to meet his obligations to achieve journeyman status rather than six months."  (Arbitration Op. 37.)  UPPCO contends that Hansen's prior apprenticeship has already been terminated and that state law only provides Hansen the ability to start a new apprenticeship, not to resume the old one.  As an initial matter, it is not clear that the arbitral award actually requires UPPCO to resume the prior apprenticeship.  Regardless, the Court finds that UPPCO has not established a likelihood of success on this claim because the issue has not been briefed.  UPPCO did not discuss this issue in its brief supporting the motion for a stay— indeed, UPPCO did not include any discussion of its likelihood of success on the merits of its claims in that motion—and IBEW accordingly did not address the issue in its response.  Given the lack of briefing on this topic, and the fact that it is UPPCO's burden to establish its entitlement to a stay, the Court finds that UPPCO has failed to show a likelihood of success on the merits of this claim.[5]

---

[5] It is also unclear how this aspect of the arbitral award—i.e., the requirement that Hansen's apprenticeship is resumed—will cause UPPCO any irreparable harm separate from the asserted harms caused by the rest of the award. To put it another way, if the Court granted a stay only on this limited basis, and thus required UPPCO to reinstate Hansen but restart (instead of resume) his apprenticeship, it is not clear that this would alleviate any of the harms asserted by UPPCO.

## IV. MOTION TO SEAL

Before closing, the Court will address one additional matter: IBEW's pending motion to seal briefs in this case to prevent disclosure of Hansen's medical or psychological information (ECF No. 30).  The Court previously allowed UPPCO to file the complaint under seal due to Barnes's phone conversation discussing potential psychological assistance and the confidential supplemental order requiring that assistance.  Upon further review, however, it is clear that neither the complaint nor the attached documents contain any substantive information about medical treatment or diagnosis.  Barnes's speculation about vague psychological conditions does not seriously implicate Hansen's medical privacy rights so as to overcome the public's interest in transparent court proceedings.  *See Rudd Equip. Co., Inc. v. John Deere Constr. & Forestry Co.*, 834 F.3d 589, 594 (6th Cir. 2016) ("[I]n making this determination, a court must balance the litigants' privacy interests against the public's right of access, recognizing our judicial system's strong presumption in favor of openness.").  Accordingly, the Court will deny the pending motion to seal and direct the Clerk of Court to unseal the complaint and attached exhibits.

## V. CONCLUSION

The Court finds that UPPCO has not shown a likelihood of success on the merits of any of its claims.  Thus, UPPCO is not entitled to a stay of enforcement of the arbitral award.  An order will issue consistent with this Opinion.


Dated: March 20, 2026                    /s/ Hala Y. Jarbou
                                         HALA Y. JARBOU
                                         CHIEF UNITED STATES DISTRICT JUDGE


18